IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

- - - - - - - - - - - - - - - x
                      :
IN RE:                :
                      :    Case No. 17-26769
BURTONSVILLE CROSSING, LLC,   :    (Chapter 11)
                      :
     Debtor.          :
                      :
- - - - - - - - - - - - - - - x    January 24, 2018

                                 Greenbelt, Maryland

**HEARING**
**TESTIMONY OF KRAIG DANIELSON ONLY**

**[16] Motion to Dismiss Case filed by Creditor EagleBank,**
**[23] Opposition filed by Debtor Burtonsville Crossing, LLC.**

         BEFORE:   THE HONORABLE THOMAS J. CATLIOTA, Judge
                  THE HONORABLE WENDELIN I. LIPP, Judge

<u>APPEARANCES</u>:               A. DONALD C. DISCEPOLO, Esq.
                             8850 Columbia 100 Parkway
                             Suite 310
                             Columbia, Maryland  21045
                              On behalf of the Debtor

                             BENJAMIN SMITH, Esq.
                             Shulman Rogers Gandal
                             Pordy & Ecker, P.A.
                             12505 Park Potomac Avenue
                             Sixth Floor
                             Potomac, Maryland 20854

Audio Operator:            Rita Hester

Proceeding recorded by electronic sound recording,
transcript produced by transcription service.

Transcription Company:          CompuScribe
                                5100 Forbes Boulevard
                                Suite 101
                                Lanham, Maryland  20706
                                301/577-5882

# **I N D E X**

Page

Preliminary Matters                                             4


| WITNESSES<br>For the Debtor: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Kraig Danielson | 4 | 19<br>23(CT) | -- | -- |

1                    P R O C E E D I N G S

2              (Whereupon, at 2:21 p.m., the proceedings began.)

3              THE CLERK:  All rise.  The United States

4    Bankruptcy Court for the District of Maryland is now in

5    session.

6              (Pause)

7              THE COURT:  Good morning.

8              MR. DISCEPOLO:  Don Discepolo, Discepolo, on behalf

9    of the Debtors.  Mr. Norris is here and Mr. Danielson is

10   here, as well.

11             THE COURT:  Very good.

12             (Whereupon, at 2:50 p.m., the testimony of Kraig

13   Danielson follows.)

14   Whereupon,

15                        KRAIG DANIELSON

16   was called as a witness by the Debtor, having been first duly

17   sworn, was examined and testified as follows:

18                      DIRECT EXAMINATION

19             THE CLERK:  For the record, sir, please state your

20   full name and address.

21             THE WITNESS:  Kraig Danielson, 525K East Market

22   Street in Leesburg, Virginia.

23             THE CLERK:  Thank you.

24             MR. DISCEPOLO:  Thank you Your Honors.

25   BY MR. DISCEPOLO:

1   Q    Mr. Danielson, briefly for the Court I would like to

2   outline your background and your experience.  Where did you

3   go to college?

4   A    University of Washington, in Seattle.

5   Q    Did you do any graduate work?

6   A    No, I did not.

7   Q    Come a point in time when you traveled to New York City

8   to work for Goldman Sachs?

9   A    Yes.

10  Q    Please tell the Court what you did there.

11  A    Yes, I worked for Goldman Sachs in their real estate

12  investment banking group.  Worked there in New York with

13  various stints in Chicago and London and left there in

14  1996.

15  Q    And how long were you there?

16  A    Six years, I think.

17  Q    And your position when you left?

18  A    Associate, I think, is what I was called.

19  Q    And after 1996 where did you go work?

20  A    I -- a friend of mine from Drexel Burnham, he and I

21  worked together.  And did some boutique investment banking

22  for about eight years together in various different

23  industries.

24  Q    And what was the name of that concern?

25  A    It was Tioga Capital.

1   Q   And your position there?

2   A   Vice president.

3   Q   And how long were you there?

4   A   I think I have to do the math, probably -- eight years.

5   Q   So, that brings us up to around 2004.

6   A   Yeah.

7   Q   Where did you go after that?

8   A   Then -- at that point -- sorry.

9   Q   It is okay.

10   A   I was -- I went with Corbin and we started doing -- call

11   it special situations, real estate, asset back-loans.  And

12   have been doing that for the last 13 year or so.

13   Q   So, in 2004 what was your position?

14   A   Managing director.

15   Q   And your position today?

16   A   Same thing.

17   Q   So, just briefly for the Court and in the interest of

18   time, Corbin Partners, you said you were doing special

19   situation financing, how much capital do you have for

20   investing?

21   A   With our capital partners we have about a billion that

22   is available, or rather that is under management.  Some of it

23   is invested in liquid and at various times it is usually

24   between a hundred and two hundred million that is available

25   for investing.

1   Q   And is that available on today's date for investing?

2   A   Yeah.

3   Q   The type of special situations that you have done at

4 Tioga Capital and Corbin and even before that at Drexel

5 Burnham, how many deals do you think you have been involved

6 in, in the past 20 years?

7   A   That would be difficult -- hundreds, you know.

8   Q   And if you were going to attach a dollar amount to that

9 what would it be?

10   A   They add up pretty quickly. I actually do not know. I

11 mean several billion.

12   Q   All right.

13   A   When I was at Goldman I was managing six billion dollars

14 worth of assets just then. So, I don't know -- what it would

15 be.

16   Q   And the situation that brings us here today, have you

17 had any prior experience in these type of special financing

18 situations?

19   A   Yeah. We -- so what we do is we get involved in

20 situations where there are complexities either with the

21 property, the borrower or the seller if it is an

22 inquisitive sort of situation. We have been involved where

23 we have financed out of foreclosure or bankruptcy. I have

24 never had the privilege of actually testifying before. So,

25 this is --

1    Q    I apologize.

2    A    -- new for me.  But, yeah, being in foreclosure or

3    bankruptcy does not frighten us away because it is where --

4    we are asset back-lenders, we are not -- credit based

5    lenders, per se.

6    Q    And if you were going to introduce yourself at a dinner

7    party, what is it that you do for a living?

8    A    Real estate finance.

9    Q    Okay.

10            MR. DISCEPOLO:  And at this time pursuant to

11   Federal Rule 702 I would offer Mr. Danielson as an expert in

12   real estate finance.

13            THE COURT:  Any objection?

14            MR. SMITH:  No objection so long as we are not

15   offering Mr. Danielson as an evaluation expert.  It has been

16   shown that you would need appraisal to do the loan which

17   leads me to believe that he is not an expert in valuing real

18   estate.

19            MR. DISCEPOLO:  I will proffer to the Court that he

20   is going offer an opinion to a reasonable degree of

21   professional certainty as to whether or not this loan is

22   going to close.  That is going to be his ultimate opinion in

23   this matter.

24            MR. SMITH:  Well, it --

25            THE COURT:  He will be so appointed.

1          MR. SMITH:  Okay.

2          THE COURT:  He is submitted.

3    BY MR. DISCEPOLO:

4    Q    For the record, do you have an opinion as to a

5    reasonable degree of business certainty as to whether or not

6    this loan with the Debtors is going to close?

7    A    Reasonable degree of certainty, yes.

8    Q    And what is that opinion?

9    A    It means that it is not closed yet.  And as the

10   representative from EagleBank said, you know, things can

11   happen.  But we are working through the process.  We have,

12   you know, I visited the site, we have done our -- you know --

13   we are working through the various business analysis that we

14   need to do in order to get to a closing.

15   Q    And for the record, I am sure that both Judges are

16   going to want to hear, we will get into the nuances of the

17   different properties in a second, but both Judges are going

18   to want to hear what you have done, what you need to do and

19   ultimately when you think the time frame is going to be for

20   the loan to close.

21          So, let us start with what you have done.  Tell the

22   Judges what you have done up to today's date.

23   A    Right.  So, the focus to date has been primarily on the

24   Elder home property, rather than the other piece.  It

25   actually was not initially the 11 acres were not initially

1   part of our collateral piece.  And we determined a few weeks

2   ago that it was going to be necessary to include that, as

3   well.  Maybe that was more like two weeks ago.

4          So the majority of what we have done thus far has

5   been reviewing, especially the zoning and entitlement

6   situations, because that is critical to the pathway for this

7   property.

8   Q    Specially let us take those in two parts.  Zoning.  As

9   far as your due diligence is concerned, what due diligence

10  are you presenting doing now on zoning?

11  A    So, how much in the weeds do we want to go?

12  Q    I -- well -- bad question to ask a lawyer.  But what we

13  want to do is we want to inform the Judges enough to let them

14  know what you are doing, an idea of what you are doing, and

15  what you need to be -- to do to get it done.

16  A    Right.  So, without going into, you know, three weeks of

17  work on understanding the zoning entitlements and process in

18  Montgomery County and Maryland.  There were multiple layers

19  that need to be accomplished.

20         It all starts with, as referred to before, that

21  this -- that the Elder home property is in the R200TDR Zone.

22  And what that means in detail with respect to things that

23  are outside of single family detached housing, there is a

24  several page list of other types of facilities or buildings

25  that can be built on it, including assistant living

1    facilities.  And within that category there are certain other

2    limitations.

3              And so, if Mr. Norris was to build a 16 unit --

4              MR. SMITH:  Your Honor, I am going to object to

5    this.  He is --

6              THE WITNESS:  Rambling on.

7              MR. SMITH:  No.

8              MR. DISCEPOLO:  Shhh, just wait for the Judge to

9    rule.

10             MR. SMITH:  My issue is that there is no

11   indication that we have that he is an expert on zoning in

12   Montgomery County.  I appreciate that he has a great deal of

13   experience in assessing, you know, whether a property is a

14   good investment.  However, opining as to what an R2000 Zone

15   means in Montgomery County specifically, I do not believe

16   that he has been shown to have that experience.

17             MR. DISCEPOLO:  With all due respect, Your Honors,

18   you have two documents in front of you for zoning.  That you

19   have no idea what they are.  They were just printed out.

20   They were put before you.  This is a witness based on his

21   education, training, experience and his personal knowledge

22   under 702 or 701, under a lay opinion which may benefit the

23   Court in understanding the issues.

24             He can clarify exactly what Counsel as he has

25   opened the door with respect to the zoning issues, what it is

1   and in order for this man and his partners to make a loan,

2   what they have to do in order to satisfy the loan

3   commitments.  In that context, in his underwriting preview he

4   is saying this is what it has got to be, this is what needs

5   to be happening.

6           Counsel opened the door when he gave you those

7   two documents.  At this point in time we have got an

8   individual that has firsthand experience of what is going on,

9   not just a piece of paper that was printed out off the

10  internet.

11          MR. SMITH:  If I may respond, Your Honors.  That

12  piece of paper printed off the internet is an official zoning

13  map from Montgomery County with an official legend

14  designation for that specific piece of property.

15          And furthermore, if what is being offered is a lay

16  opinion, then that does not sound to me like he knows what he

17  is -- as an expert discussing with regard to zoning in the

18  County.

19          THE COURT:  I think it is clear he is not an

20  expert in Montgomery County zoning and he was not offered

21  as such.  I would borrow a phrase from hearsay and say this

22  is not coming in for the truth of the matter.  He is not

23  coming -- he is not testifying to what the zoning is in

24  Montgomery County for us to understand it.  He is testifying

25  that this is what he understands the problem and this is what

1   he understands he has to do to get the loan closed.

2          So, for that purpose we will let it in.  But it is

3   not coming in as an authoritative statement of what the

4   zoning in Montgomery County is.

5          MR. SMITH:  Thank you, very much, Your Honors.

6          MR. DISCEPOLO:  Thank you, Your Honors.

7   BY MR. DISCEPOLO:

8   Q    Proceed, please.

9   A    Yeah, I think actually -- to kind of thank you for the

10  interruption because I -- so, yeah, we have spent a long time

11  reviewing the entitlements.

12         We are certainly -- I would never claim that I am

13  an expert, but in order for us to go through the analysis to

14  determine whether we can underwrite the loan, we have to go

15  through this process.  Because the entitlements for a 128

16  unit assisted living facility were granted 20 years ago.

17  There were certain renewals that were done on that.  As a

18  result of that approval, so just generally speaking, there

19  are kind of three layers after you are in the general zoning

20  area, there are three layers of steps.

21         One is getting Special Use or Special Exception

22  provision, which it was called before 2014, now it is called

23  a Conditional Use.  Once you have got that then you need to

24  make sure that you get a proper subdivision platting down.

25  And then after that you can go and get your architectural and

1  engineering work done and then get a building permit and then

2  you can put it -- a shovel in the ground.  So, there are

3  several steps that need to happen.

4          Twenty years ago there was a special exception

5  approval that was granted.  And as a result of that 10 years

6  later, mainly because of just the administrative work that

7  was necessary to take, Mr. Norris got the subdivision

8  platting completed and -- I think it is called the Adequate

9  Public Facilities Approval.

10         So, the point is, is that the first entitlement to

11 build a certain number of units on the property expired.  And

12 in a similar time frame that the second layer of it was

13 approved.  So, now we are kind of in this funny situation

14 where the second piece of it is approved but the second --

15 but the first part is not.

16         So, what is necessary from our underwriting

17 standpoint is to understand the risks and hurdles that are

18 necessary to go through that process again and get the

19 Conditional Use given the fact that the -- subdivision

20 approval has already been made.

21 Q    And that Special Use process, do you have any

22 information as to how long that is going to take?

23 A    Yeah, in our review with several different zoning

24 attorneys, it will take between six and nine months and there

25 are a couple of -- of, you know, different pathways in there,

1 but generally speaking that is about the time frame it should

2 take.

3 Q   So, as far as you and your partners funding this

4 project, what if any information do you need with respect to

5 that Special Use process in order for your due diligence to

6 be done for you to close the loan?  What type of information

7 do you need?

8 A   Well, what we have been reviewing is -- so, there is --

9 within those categories that I have mentioned there are

10 subcategories.  Traffic studies, water and sewer access --

11 matching with the Master Plan, et cetera.  So, there is a

12 whole list of things which we are going through and we are

13 ticking off as we go along.

14        The Master Plan criteria for example, typically

15 the -- the rule is to be able to show that this Condition

16 Use would be acceptable under -- under the Master Plan.  In

17 this particular case, because of the fact that the approval

18 for this facility had happened prior to when the Master

19 Plan was actually submitted, this particular property is

20 actually noted in the Master Plan as an assisted living

21 facility.

22        So, it is actually -- not only does it just meet

23 the general criteria of the Master Plan it is specifically

24 noted.  Which is actually fairly rare.

25 Q   So, in doing your due diligence when are you going to

1    come to a -- in your opinion when are you going to come to a

2    point in time with whatever information you need to make a

3    determination on this loan?

4    A     Well, there is -- there is the process of underwriting,

5    you know, it involves all those pieces that I've just

6    mentioned.  We still got some -- some research to do on some

7    public information with regard to traffic studies and all

8    that sort of thing to get comfortable with the risks.  So,

9    you know, it is moving in the right direction at a good

10   pace.

11   Q     And if you were going to give an estimate as to how

12   long this is going to take, do you have a time frame in

13   mind?

14   A     Well, I would think within a couple of weeks.

15   Q     Is it a fair statement to say that you and your partners

16   are moving as quickly as you can to determine whether or not

17   you are going to fund this loan?

18   A     Yes.

19   Q     Has the Debtor been cooperative with respect to giving

20   you all the information that you have requested in moving

21   this along?

22   A     Yeah, to the extent that we have required it and he has

23   also provided us access to his -- not representatives, but,

24   you know, people that he works with, with regard to the

25   entitlements and environmental and et cetera.

1    Q    Is there anything that you have seen up to this point in

2    time that would lead you to believe that this loan is not

3    going to close?

4    A    Not yet.

5    Q    Now, with respect to -- you were in the courtroom

6    before.  I do not know if you heard the testimony.

7    Purchasing the note from the Bank outright, is that something

8    that you and your partners are interested in?

9    A    We do that.  And in this case we prefer to.

10   Administratively it will be easier.  There is a whole slew of

11   reasons why we would prefer to do that.

12   Q    And did --

13   A    And the --

14   Q    Did you make that offer to the representative from the

15   Bank?

16   A    We did.  Yes.

17   Q    And what, if anything, was the response?

18   A    Although I would clarify that we did not make an offer

19   in, you know, kind of like formal.  It was -- it was

20   informal.  And we did not talk specific pricing, we were just

21   collectively very vague on purpose because we had not come up

22   with a -- an appropriate price yet.

23   Q    Okay.

24   A    It was really just would you sell it, if -- you know,

25   just -- rather than accepting payoff.

1    Q     And would you have to do all the due diligence you are

2    doing with the entitlements and Special and everything if you

3    purposed the note outright?

4    A     Yes.  Although it -- what would be shortcut would be the

5    process after that, the loan documentation, all of that sort

6    of work would be significantly shortcut.

7    Q     Have you ordered an appraisal?

8    A     Yeah.

9    Q     And when do you expect that appraisal to come in?

10   A     Within about two weeks, yeah.

11   Q     Did you request an appraisal from the Bank?

12   A     It was -- so, we have communicated with a lot of

13   different people in the market.  And, you know, a variety

14   of different people know about this property.  And through

15   those contacts we found out that EagleBank had done an

16   appraisal about two months ago, approximately.  I don't know

17   exactly, nor do I know who did it.  I just know that it was

18   done.

19          So, because of that we did request that appraisal

20   because that would -- any additional points of information

21   would help us in our underwriting.

22   Q     Is it a fair statement to say that you need the

23   appraisal before you can fund the loan?

24   A     From a policy standpoint, yes.

25   Q     And the timing of getting the appraisal, does that

1  coincide with the timing for your due diligence that you are

2  doing for the Special Use?

3  A    We are expecting it to be consistent with that kind of

4  time frame, yeah.

5  Q    In addition to the Special Use due diligence you are

6  presenting doing and waiting on the appraisal, is there

7  anything else that you are waiting on with respect to

8  underwriting this loan?

9  A    There was an environmental study that was done a while

10 ago that we are having refreshed, as well.

11 Q    And how long is that going to take?

12 A    Similar kind of -- two week time frame.

13 Q    Is it a fair statement to say that within two weeks you

14 are going to have all the information you need to determine

15 whether or not you are going to fund this loan?

16 A    Well, I would not want to limit myself.  But generally

17 speaking I would say yes.

18         MR. DISCEPOLO:  No further questions.

19         THE COURT:  Cross.

20         MR. SMITH:  Sure.

21                         CROSS EXAMINATION

22 BY MR. SMITH:

23 Q    Good afternoon.

24 A    Hi.

25 Q    So, you indicated that it would take six to nine months

1   for full zoning approval, is that correct?

2   A    That is what has been communicated to us.

3   Q    Okay.  And just to clarify, you said you are waiting for

4   due diligence for specific entitlements to be completed

5   before you all can fund the loan?

6   A    Not -- no, that is not exactly what I said.

7   Q    If you could clarify that, that would be great.

8   A    Yeah.  No, what I said was that to do that six to nine

9   month process a lot of that actually is waiting.  You know,

10  you set up an appointment and you wait.  But the point is, is

11  that within those -- within that process there are several

12  criteria that are necessary to either -- you know, we want to

13  break this role or we can show that we are fitting into -- in

14  this role.  That is basically what the Conditional Use

15  exercising is.

16         Those include things like insuring that there is

17  sewer and water access, that that adding the additional

18  volume of traffic that this would add, wouldn't negatively

19  impact traffic, et cetera.

20         So, those sorts of things we are going through the

21  information that we can to determine what the -- what we

22  believe the risks are in that Conditional Use process.

23  Q    Okay.  And --

24  A    And so it is -- at the end of the day, it is a risk

25  analysis underwriting sort --

1    Q    And you believe that --

2    A    -- of process.

3    Q    And --

4    A    Sorry.

5    Q    -- maybe I am misunderstanding.

6    A    Yeah.

7    Q    I am trying to understand. What is -- what is it that

8 you need -- I did not completely understand from your answers

9 from Counsel's questions --

10    A    Sure.

11    Q    What exactly has to get done so that you can fund the

12 loan within two weeks from now?

13    A    Well, no, what I was saying is that I expect that our

14 due diligence process would be ending around two weeks from

15 now.

16    Q    So, your analysis of those things that would take a much

17 longer time will take a couple of weeks to perform?

18    A    Right. Right.

19    Q    Okay.

20    A    So, what -- all we are doing is the risk analysis of

21 those things. And then -- what -- in terms of our process,

22 once we get finished with the due diligence, then that means

23 that we then go through the loan documentation and all the

24 other various aspects that we need to do to be able to

25 actually close the loan.

1    Q    And you have to go through this process with a lot of

2    loans or is this unique?

3    A    Every loan is unique.  But --

4    Q    Well, let me rephrase --

5    A    -- but --

6    Q    -- when you are looking at potential zoning approvals,

7    they could take -- up -- at least half a year or longer --

8    A    Yes.

9    Q    -- is that unique?  Is that something that you deal with

10   regularly for your portfolio?

11   A    Yeah, dealing with zoning issues is normal for us to

12   review.  Yes, absolutely.  This is a particular unique

13   situation because of that sequence of events that I mentioned

14   before.  They did one and they got two done, and one went

15   away and -- yeah.

16   Q    And you indicated that the Burtonsville property is now

17   going to be part of your collateral, as well?

18   A    Yes.

19   Q    What impact, if any, does the pending lawsuit by

20   Montgomery County -- have in your decision making?

21   A    I thought it was the other way around.  I think --

22   Q    Well, you are correct --

23   A    -- isn't Montgomery County --

24   Q    -- it is a lawsuit between --

25   A    -- the Defendant?

1    Q    -- Burtonsville Crossing and Montgomery County,

2    Maryland.

3    A    Right.

4    Q    And it relates to -- I believe there -- the Debtor would

5    characterize it as a water and sewer permissions issue tied

6    to religious entity.  But have you had a moment to review

7    that situation, that lawsuit?

8    A    I have not read the whole lawsuit, no.  But I am aware

9    of it and I have reviewed that situation.

10   Q    And --

11   A    To the extent that --

12   Q    -- is that a factor in whether or not you will fund your

13   loan?

14   A    No.  I mean I will still take that as collateral with

15   that lawsuit pending.

16   Q    Oh.

17   A    If that is what you are asking.

18   Q    That is what I am asking.

19            MR. SMITH:  No further questions, Your Honors.

20            THE COURT:  Mr. Danielson, you may have answered

21   this and forgive me  but -- is the amount of the loan

22   sufficient to pay the Bank's claim in full including attorney

23   fees, interest, everything, as far you know?

24            THE WITNESS:  Our numbers actually were a little

25   bit behind what she quoted today.  But, yes.  I am just doing

1    that in my head for a second because we are a little bit off.

2    But we had a reserve available that we can move some funds

3    around, so, yes.

4              THE COURT:  All right.  Any redirect?

5              MR. DISCEPOLO:  None, Your Honor.  May the witness

6    be excused, Your Honor?

7              THE COURT:  You may step down.

8              THE WITNESS:  Thank you.

9              (Whereupon, at 2:14 p.m., the testimony of Kraig

10         (Whereupon, at 2:14 p.m., the testimony of Kraig

11   Danielson was completed.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I certify that the foregoing is correct transcript from the duplicated electronic sound recording of the proceedings in the above-entitled matter.

*Karen Morganelli*  08-01-18
_____
Karen Morganelli                Date
Certified Transcriber
Certificate No.:  CET**D-577